AO 91 (Rev. 11/11) Criminal Complaint AUSAs Christopher J. Stetler (312-353-7602) and Nani Gilkerson (312-469-6049)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
APR 24 2017
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CHRISTOPHER LAWRENCE,
also known as "Black"

CASE NUMBER:

**UNDER SEAL**

17CR 263

**CRIMINAL COMPLAINT**

MAGISTRATE JUDGE VALDEZ

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 27, 2015, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere, the defendant, CHRISTOPHER LAWRENCE, violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Section 922(g)(1) | having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting interstate commerce a firearm, namely, a Smith and Wesson, model 5904, 9-millimeter pistol, bearing serial number TDD6687, which firearm had traveled in interstate commerce prior to the defendant's possession of the firearm |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

ERIC J. KOSLOWSKI
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to before me and signed in my presence.

Date: April 24, 2017

*Judge's signature*

City and state: Chicago, Illinois

Maria Valdez, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT | ss
NORTHERN DISTRICT OF ILLINOIS |

**AFFIDAVIT**

I, ERIC J. KOSLOWSKI, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and I have been so employed for approximately three years. My current responsibilities include the investigation of firearms and narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that CHRISTOPHER LAWRENCE, also known as "Black," has violated Title 18, United States Code, Section 922(g)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging LAWRENCE with being a felon in possession of a firearm, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, witness interviews, and my review of draft transcripts of consensually recorded conversations. My descriptions of conversations and bracketed understandings of statements in this affidavit are summaries based on my initial review of draft transcripts and recordings and my training, experience, and involvement in the investigation. Those descriptions are

not based on final, verbatim transcripts, and the times listed for the conversations are approximate. Voice identifications are based on individuals' familiarity with the speakers' voices through consensually recorded meetings. Because this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in the recorded conversations, and I have not included all of the facts known to me or other law enforcement officers about the investigation.

***Summary of the Investigation***

4. As explained in more detail below, CHRISTOPHER LAWRENCE is a felon who has distributed firearms, cocaine, and crack cocaine in the Chicago area, including to a confidential source ("CS2") and an undercover law enforcement agent ("UC1") posing as one of CS2's narcotics customers.

***LAWRENCE Sells UC1 Approximately 4.7 Grams of Cocaine***

5. On or about June 23, 2015, at approximately 11:55 a.m., CS2 and UC1 had a consensually recorded telephone call with LAWRENCE to arrange the sale of cocaine from LAWRENCE to CS2. According to a recording of the call, LAWRENCE said, "I already called my man [cocaine supplier] already. He waiting for us." LAWRENCE said, "When he [LAWRENCE's cocaine supplier] gets back into his apartment, he's gonna give me the stuff [cocaine] when I meet him up there with the money, get the shit from him, and I come back down and give you y'all shit, and y'all can go. That's the way he do business, man." UC1 responded, "Yeah, but I like to look..." LAWRENCE interrupted, "It ain't gonna make me or break me. I

don't need money or your shit. I got my own money. So as far y'all calling me to do something for y'all, I'm doing it out of kindness for y'all. You know, you're giving me shit for doing nothing for you.... My man [CS2] just called me and asked me to get this shit, and that's what I did." UC1 said, "I just want to take a look at it [the cocaine], man, [to] make sure it's good. 'Cause if ... it ain't good, I don't want it." LAWRENCE responded, "Okay. Then I'll go back upstairs [to retrieve the cocaine for UC1] and get you, your money.... I'm gonna tell him to give me the shit, and then I'll bring it down and bring him his money back." UC1 said, "[T]hat's perfect, man. Alright, we're coming over." CS2, UC1, and LAWRENCE then agreed to meet in front of a liquor store located on the 1100 block of North Milwaukee Avenue in Chicago.[1]

6. Later that day, at approximately 12:32 p.m., UC1 and CS2 met in Chicago with LAWRENCE so LAWRENCE could facilitate the sale of cocaine to UC1, who recorded the meeting. According to a recording of the meeting, LAWRENCE said, "This [the sale of cocaine to UC1] is petty.... This is nothing compared to what I do. Two balls [the quantity of cocaine that UC1 was buying] ain't shit." LAWRENCE left and then returned to UC1 and CS2. When he returned, LAWRENCE handed UC1 two clear, plastic bags containing an off-white,

---

[1] According to a law enforcement database, CS2 has been convicted at least nine times for offenses that include burglary, theft, obstruction of justice, forgery, and battery. CS2 is cooperating with law enforcement in return for financial compensation. No other promises have been given to CS2 regarding what, if any, benefit CS2 may receive in return for CS2's cooperation. As explained below, law enforcement is familiar with LAWRENCE's voice based on in-person, consensually recorded meetings with LAWRENCE, during which LAWRENCE spoke.

chunky substance that, according to a subsequent lab analysis, tested positive for the presence of cocaine and weighed approximately 4.7 grams. LAWRENCE said, "Open it up. Smell it so you know [the cocaine was good quality]." After UC1 commented that UC1 could smell it, LAWRENCE said, "He [LAWRENCE's cocaine supplier] bitched about you not giving me the money. Like, 'Man, after this you either bring the money, or fuck them. I ain't catering to nobody.' ... That's how me and him been doing business." UC1 paid LAWRENCE approximately $400, which LAWRENCE counted. LAWRENCE asked, "Do I get a twenty [dollars] or something for my troubles?" UC1 paid LAWRENCE an additional $20. LAWRENCE continued, "I cook shit [cocaine into crack cocaine]." UC1 asked, "[W]hat would he [LAWRENCE's cocaine supplier] do for me on the fucking hard [crack cocaine], man?" LAWRENCE said, "[H]e not the only one I deal, I fucks with, okay?... I got different sources.... We can work together." LAWRENCE said he needed to be careful with who he deals with because "I've been in the feds [LAWRENCE has a federal conviction] and shit."[2]

***LAWRENCE Sells UC1 Approximately 25.3 Grams of Crack Cocaine***

7. Between on or about June 25, 2015, and on or about July 1, 2015, UC1 negotiated the purchase of crack cocaine via text message with the phone number LAWRENCE used to coordinate the June 23, 2015, cocaine sale summarized above ("LAWRENCE's Phone"). UC1 wrote, "u get that # [price] for me on da zipper

---

[2] According to a law enforcement database, LAWRENCE has several felony convictions. On or about September 20, 2005, for example, LAWRENCE was convicted in the United States District Court for the Northern District of Illinois of using a communication facility to facilitate the distribution of a controlled substance, which is a felony.

[ounce of cocaine?]" LAWRENCE's Phone responded, "U want it hard [crack cocaine] or sofa [powder cocaine?]" UC1 responded, "dat hardball [crack cocaine]." After UC1 wrote that he would be available to purchase the crack cocaine on July 1, 2015, LAWRENCE's Phone wrote, "Ok go to same spot [the liquor store located on the 1100 block of North Milwaukee Avenue in Chicago]."

8. On or about July 1, 2015, UC1, UC2, and CS2 met in Chicago with LAWRENCE so LAWRENCE could facilitate the sale of crack cocaine to UC1, who recorded the meeting. According to a recording of the meeting, during the meeting, LAWRENCE handed UC1 a clear, plastic bag containing an off-white, rock-like substance that, according to a subsequent lab analysis, tested positive for the presence of cocaine base and weighed approximately 25.3 grams. UC1 asked, "Man, that measure up right?" LAWRENCE answered, "No, it's all right here. Everything there for you.... It's weighed out right." UC1 paid Lawrence approximately $1,600. LAWRENCE asked, "It's sixteen [hundred dollars] right there, right?" UC1 answered, "Yeah, we're good, man."

***LAWRENCE Sells UC1 a Firearm***

9. On or about August 4, 2015, UC1 had a consensually recorded telephone call with LAWRENCE. According to a recording of the call, UC1 said that CS2 "was telling me that you got that 40[-caliber firearm] that looks nice." LAWRENCE said, "I was really trying to give it up, actually." UC1 asked, "How much you're talking [about selling the firearm for], man?" LAWRENCE answered, "Uh, maybe is just gonna be anywhere, like, maybe three-fifty [$350], because ...

three [$300].... [G]ive me a couple of days, and then I can tell you what to do, come get it or whatever."

10. On or about August 26, 2015, at approximately 6:18 p.m., UC1 had a consensually recorded telephone call with LAWRENCE, who—according to a recording of the call— said, "I just talked to one of my buddies. He said he got a tre eight [38-caliber firearm]." UC1 asked, "How much he want?" LAWRENCE answered, "He want three [$300]." UC1 asked, "[W]hen is he going to have this shit?" LAWRENCE answered, "We can get it now, whenever you ready."

11. Later that day, at approximately 7:34 p.m., UC1 had a consensually recorded telephone call with LAWRENCE, who said he could arrange the sale of a .40-caliber gun to UC1. According to a recording of the call, when LAWRENCE provided UC1 with the price for the .40-caliber gun, UC1 said, "[T]hat's way too much, man. I can't do that shit, man.... Let's do, just do the three eight zero [.38-caliber firearm], man." UC1 asked, "Three fifty [$350]?" LAWRENCE answered, "Yeah."

12. On or about August 27, 2015, at approximately 2:49 p.m., UC1 had a consensually recorded telephone call with LAWRENCE. According to a recording of the call, LAWRENCE said, "My man just said that he, that dude ain't answered him back for the tre eight [.38-caliber firearm]. But he said this is what he'll do for you since you kinda wanted the forty[-caliber firearm]. He said he'll give it to you for eight [hundred dollars]. And he said that ain't high 'cause it's ... brand-spanking new. I saw it. I seen it with my own eyes." UC1 said, "Eight's [$800 is] a lot."

LAWRENCE said, "I know, bro', but ... where you going to go get a brand-new one from? [The gun had] Never been shot." LAWRENCE agreed to contact his purported firearms source and call UC1 back.

13. Later that day, at approximately 4:34 p.m., UC1 had a consensually recorded telephone call with LAWRENCE. According to a recording of the call, UC1 said, "I can do it, but is it really that nice?" LAWRENCE said, "I don't sell no bullshit.... I'm gonna call him [LAWRENCE's firearms source] 'cause he got in touch with his other people to see what else [other firearms] they got [to sell]."

14. Later that day, at approximately 4:55 p.m., UC1 had a consensually recorded telephone call with LAWRENCE to arrange UC1's purchase of a firearm. According to a recording of the call, UC1 said, "I'll pull up to the same spot [where UC1 had previously purchased crack cocaine from LAWRENCE]."

15. Later that day, at approximately 6:33 p.m., UC1, UC2, and CS2 met with LAWRENCE in Chicago so LAWRENCE could facilitate the sale of a firearm to UC1, who recorded the meeting. According to a recording of the meeting, LAWRENCE handed UC1 a plastic bag and said, "Here you go. Check it out." UC1 then opened the bag, which contained a loaded Smith and Wesson, model 5904, 9-millimeter pistol, bearing serial number TDD6687. UC1 provided LAWRENCE with headphones and approximately $700. LAWRENCE then contacted his firearms supplier on the telephone, which he gave to UC1. The firearms supplier and UC1 then agreed for UC1 to pay $750 for the firearm. UC1 provided LAWRENCE with an additional $50.

16. Later that day, at approximately 7:20 p.m., UC1 had a consensually recorded telephone call with LAWRENCE. According to a recording of the call, LAWRENCE said, "[Y]ou gotta hit me next time [UC1 wants another firearm]. You gotta treat me right." LAWRENCE expressed his displeasure that his firearms source left bullets in the gun sold to UC1, saying, "And it had bullets in it.... I cussed him out [for providing a loaded gun]. I don't pass no gun over, the motherfucker had bullets in the gun.... I don't know what you could've been capable of doing."

***Conclusion***

17. Based on the above information, I believe that there is probable cause to believe that on or about August 27, 2015, LAWRENCE committed the offense of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).

FURTHER AFFIANT SAYETH NOT.

ERIC J. KOSLOWSKI
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on April 24, 2017.

Maria Valdez
United States Magistrate Judge